IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
_____

BRAVA SALON SPECIALISTS, LLC,

      Plaintiff,                          OPINION AND ORDER

      v.                                 22-cv-695-wmc

REF NORTH AMERICA, INC. and
REF INTERNATIONAL AB,

      Defendants.
_____

      In this lawsuit, plaintiff Brava Salon Specialists, LLC, claims that defendant REF North America, Inc. ("REF NA"), and a related company, REF International AB ("REF Int'l"), breached a contract and violated the Wisconsin's Fair Dealership Law ("WFDL") by permitting another dealer to sell REF products online and in plaintiff's exclusive territories and by imposing additional obligations on plaintiff without proper notice or justification.

      Before the court is plaintiff's motion for partial summary judgment against REF NA on counts I, II, and III of its Second Amended Complaint and REF NA's counterclaims.[1] That motion will be denied, however, because there are genuine disputes of material fact regarding whether REF NA violated the WFDL or breached its contract with plaintiff.

_____

[1] Plaintiff has not moved for summary judgment on any of its claims against defendant REF Int'l, and it remains unclear from the docket whether plaintiff has successfully effected service on REF Int'l.

UNDISPUTED FACTS[2]

## I.   The Parties

REF is a Swedish hair care brand founded by Jan Ernstberger in 2004.  Defendant REF Int'l manufactures and markets REF products, which are distributed in Sweden by a company called Capstone and in North America by defendant REF NA.[3]  In turn, Capstone and REF NA provide products to dealers who sell directly to retailer salons and stylists. Thus, any authorized dealer selling REF products in North America must work with REF NA to obtain products.

REF is marketed as a high-end, "hairdresser's brand," rather than a "consumer brand," which is why Capstone and REF NA sell products only to authorized salons and stylists, rather than directly to consumers.  (J. Ernstberger Dep. (dkt. #103) 22–23, 78 ("You have to choose: Either you work with a brand for hairdressers or you work with a brand for consumers.  We chose to work with hairdressers.").)

REF Int'l, REF NA and Capstone are all wholly owned by REF Holdco AB ("REF Holdco"), which itself is owned by Jan Ernstberger, the Raptor Group (wholly owned by Jan's son, Edward Ernstberger), and apparently an (unnamed) REF sales manager.  In

_____

[2] The following factual summary provides context for plaintiff's claims and is drawn from plaintiff's proposed findings of fact, defendant's responses and the evidentiary record as appropriate.  The court addresses more specific facts in the Opinion section below as relevant to the analysis.

[3] The court exercises diversity jurisdiction over this dispute by virtue of an approximate amount in controversy far exceeding $75,000 and complete diversity of citizenship as follows. REF NA is a Massachusetts corporation with its principal place of business also in Massachusetts. Brava Salon Specialists is a Wisconsin limited liability company with its principal place of business in Madison. James Marcks is the sole member of Brava and is domiciled in Wisconsin.  Although service remains unclear, REF Int'l appears to be an EU company both by law and location.

addition to being an owner of REF Holdco, Jan Ernstberger is also its chairman of the board for REF Int'l, and a director and treasurer of REF NA.  Further, his son Edward is a board member of REF Holdco, the managing director of REF Int'l, and the president of REF NA. Finally, Paul Connolly is the secretary and president of sales for REF NA.

Plaintiff Brava Salon Specialists, LLC, is a Wisconsin beauty-products wholesaler that was created by James and Jesse Marcks and is wholly owned by James Marcks.  Brava sells products to hair salons and stylists in the midwest.

## II.    Brava Enters into Distributor Agreement with REF NA

In 2015, James Marcks met REF NA executive Paul Connolly at a beauty-product trade show.  Connolly introduced Marcks to the REF brand, specifically describing REF products as high quality, professional haircare products that were sold directly to hairstylists and salons.  Connolly proposed that the Marcks develop a market for REF products in Wisconsin and Minnesota.  Following that meeting, Connolly sent Brava samples of REF products for Ms. Marcks to use in her own salon.  Those samples convinced the Marcks of the potential for REF products, as they believed the products were of exceptional quality and reasonably-priced, while maintaining a "mystique" by only being available through stylists and salons.

Brava entered into negotiations with Connolly over the terms on which it would represent REF NA products.  According to plaintiff, Connolly repeatedly assured Brava that REF products were salon-exclusive and not sold online.  In March 2015, Connolly and Jan Ernstberger flew to Madison, Wisconsin, to meet with Mr. Marcks and execute the

3

parties' Distributorship Agreement.  (Dkt. #4-1.)    Under the terms of that Agreement, which is governed by Wisconsin law (*id.* § 13.7), REF NA granted Brava the exclusive right to purchase and distribute REF NA products in Wisconsin and Minnesota, as well as use of REF NA's trademarks in connection with the sale of its products. (*Id.* §§ 2.1, 7.1.)  REF NA also promised Brava a right of first refusal with respect to any prospective sales of its products in states neighboring Wisconsin and Minnesota which did not already have an appointed dealer.  (*Id.* § 4.1.)

In exchange for these exclusivity and territory rights, Brava agreed to do the following:

a.  Sell REF NA products in Wisconsin and Minnesota;

b.  Maintain a place of business and service personnel sufficient to meet its obligations under the Agreement;

c.  Maintain "net working capital as necessary to enable [Brava] to properly and fully carry out and perform its duties, obligations, and responsibilities under [the] Agreement";

d.  Promptly pay all amounts due to REF NA;

e.  Use its best efforts to promote the distribution and sale of REF NA products in the territory;

f.  Refrain from modifying REF NA products without REF NA's prior written permission; and

g.  Maintain "full and accurate books and records setting forth its sales of [REF NA Products]."

(*Id.* § 5.1(a)–(g))

The Agreement had a five-year term that was later extended by the parties to run until May 20, 2029, with either party retaining the right to "terminate the Agreement upon

4

written notice to the other Party for … [f]ailure of to fulfill or perform material duties, obligations or responsibilities of in this Agreement, which failure is not cured within thirty (90) days [sic] after written notice." (*Id.* § 11.2(a).)  Section 9.2 of the Agreement further defines "material breach" as: "a breach of this contract by Supplier resulting in the termination of the Distributor's ability to sell Supplier Product in the Territory."  (*Id.* § 9.2.)

### III.   Brava's Success in Wisconsin and Minnesota

In 2015, REF NA had no sales presence in Wisconsin or Minnesota.  After signing the distributorship agreement, Brava worked extensively to build its relationship with REF NA and market its products in those states.  In particular, since that time, Brava represents it spent hundreds of thousands of dollars promoting REF products and educating salon professionals about the products.  Ms. Marks also developed marketing and educational materials for REF NA products that Brava uses to train stylists.  In 2017, Brava further purchased a 10,000-square-foot warehouse in Madison for approximately $550,000, from which it stores and distributes REF products to all of its territories.  In addition, this facility houses Brava's corporate offices, including its on-site training and educational spaces.

Brava's efforts were successful in both Wisconsin and Minnesota, with Brava's sales of REF products growing over 100% since 2018.  At some point, Brava expanded its REF distributorship to North Dakota and Iowa.[4]  At some point, Brava also sold REF products

---

[4] From the record, the court was unable to discern *when* Brava first began distributing REF products in North Dakota or Iowa.  According to Connolly, he asked Marcks if he wanted to service Iowa after a distributor there went out of business.  (Connolly Dep. (dkt. #101) 101).)  Regardless,

in Michigan on a temporary basis. REF NA has formally recognized Brava's success as a dealer on multiple occasions, including naming it national "Distributor of the Year" in 2017, 2018, and 2021. As of 2022, the sale of REF products accounted for nearly 95% of Brava's total sales and profits. That year, Brava sold approximately $1.3 million worth of REF NA products across its territory, with approximately $1 million stemming from sales in Wisconsin alone. In 2023, despite the ongoing litigation, Brava sold over $1.5 million of REF products.

Between 2015 and 2021, Brava and REF NA appeared to have a good business relationship, with Brava's leadership coordinating closely with REF NA's leadership about developing a market for and growing sales of REF products. In particular, Mr. and Ms. Marcks report personally speaking or communicating via email or text with Connolly and other REF NA employees on a daily basis. Mr. Marcks also regularly spoke directly to Jan and Edward Ernstberger, and both Connolly and Jan Ernstberger (who lives in Sweden) have visited Brava's headquarters in Wisconsin.

## IV.    Brava's Proposed Expansion into Florida

Sometime before August 2021, Connolly and Mr. Marcks began discussing the possibility of Brava distributing REF products in Florida. In October 2021, Connolly announced at a REF event for wholesalers in Texas that Brava would be REF NA's

---

defendants maintain that Brava has never been named or treated as the exclusive distributor in Iowa or North Dakota. Unfortunately, neither party provided any evidence at summary judgment regarding the timing, communications, understandings or sale efforts surrounding Brava's expansion into those two states.

distributor in Florida.  Jan Ernstberger attended that October 2021 REF event in Texas virtually via Zoom.   Following the final announcement, REF NA's Education and Marketing Coordinator Natalie Newell also provided Brava a list of potential salons and contacts in Florida.  Around December 7, 2021, Mr. Marcks asked that REF NA commit to supporting "local" wholesalers, as well as reaffirm REF NA's intention going forward to distribute exclusively as in the past through salons and stylists, while continuing to prohibit sales direct to consumers through chain stores or online sellers.  As for the latter in particular, Edward Ernstberger assured Mr. Marcks that they were on the "same page" and REF NA would "only support local" sellers.

Meanwhile, Jan Ernstberger apparently had lingering concerns, including that Brava would not be a successful distributor in Florida, particularly given Brava's lack of organization and contacts there.  Ernstberger also suspected that Brava would have to make a tremendous investment to turn a profit in Florida, and that it would likely take a few years to do so.  Thus, Ernstberger told Connolly that he wanted to see a business plan from Mr. Marcks for Florida.  Connolly represents that he told Marcks that Brava may not get the territory if a business plan was not provided.

Despite Jan Ernstberger's concerns, REF NA permitted Brava to distribute REF products in Florida at some point during 2021.[5]  Moreover, on February 9, 2022, Paul Connolly emailed REF NA's listserv of interested Florida-based hairstylists and salons to announce Brava's appointment in the territory.  (Dkt. #1-5.)  In that communication,

---

[5] Neither party provides evidence or explanation of when or how that permission was granted, nor the extent to which Brava ever distributed REF products in Florida.

Connolly described Brava as an "outstanding REF NA partner" who has "set many benchmarks as to how one should care for their salons." (*Id.*)  Connolly also promised that Brava would "not simply sell you your REF NA products, but also truly want to help your salon grow." (*Id.*)  Finally, he stated that Brava had "invested in property in Florida and will soon be bringing you amazing education locally while also shipping your orders from a local warehouse." (*Id.*)

That same month, Mr. Marcks purchased an approximately $1.5 million property in Punta Gorda, Florida, which was to serve as both a vacation home and the base for Brava's operations within the state.  Soon after, Mr. and Ms. Marcks began renovating the facility for educational classes to be hosted onsite.  According to Mr. Marcks, he intended for Brava to use the facility to train stylists from all its territories.

At the same time, Brava had not provided REF NA a plan for its business operations.  On February 17, 2022, Connolly texted Mr. Marcks that Brava needed to "toss together a business plan for Florida."  On February 23, Connolly again reminded Mr. Marcks that REF NA "Need[ed] business plan for Florida."  Then, on February 24, Connolly asked that Brava's business plan include:  "progress on possibly hiring reps"; "markets that will be focus at start"; and an acknowledgement of hiring bilingual sales representatives.

Around this time, Mr. Marcks became aware that another wholesale distributor, Sayn Beauty, was interested in distributing REF products in Florida.  However, on March 21, 2022, Connolly texted Mr. Marcks stating, "Florida is all yours my friend[.] We are not going to pursue Sayn Beauty." (Dkt. #1-6.)  A week later, Connolly once again asked Mr. Marcks about Brava's business plan for Florida.

At REF NA's insistence, Brava attended a trade show in Orlando from June 4 to June 7, 2022. Brava protested this request because it did not fit into its own plans for Florida, but ultimately relented. Brava then devoted weeks preparing for the show, spending approximately $10,000 on marketing materials, travel and lodging in connection with the show. Unfortunately, that show turned out to be an abject failure as Brava sold under $2,000 worth of REF NA product. REF NA itself also spent a significant amount of money in attending the Orlando show.

Later that month, on June 27, Connolly once more asked Marcks for Brava's business plan for Florida, and on July 4, 2022, Jan Ernstberger emailed Mr. Marcks asking what Brava's timeline was for hiring sales representatives and picking up salons in Florida. In that correspondence, Ernstberger also informed Marcks that he could keep the information "quite simple." In addition, Ernstberger asked for estimates of monthly sales goals, which areas of Florida Brava would cover, when the warehouse would start to operate, and "any more interesting" information.

On July 9, 2022, Mr. Marcks responded. In particular, Marcks explained that Brava's activities in Florida would include: interviewing sales representatives; hiring two bilingual employees; a plan to ship product from Wisconsin; a plan to secure a warehouse in Florida once volume reached a high enough level to justify the investment; marketing plans; launching Destination Brava; and interviewing Florida-based educators for Brava's education team. At the conclusion of his email, Mr. Marcks further stated that if REF NA did not "want this type of representation in Florida" to "just let [him] know."

Jan Ernstberger was dissatisfied with the business plan provided by Brava. Erstberger especially found it unacceptable that (1) Brava intended to service Florida from Wisconsin and (2) Brava had made no progress in hiring people in Florida to service the territory.  However, no one from REF NA or REF Int'l asked for additional information, nor did REF NA object to Brava continuing to sell in Florida until November 21, 2022.  At that time, however, Jan Ernstberger called Marcks and told him that he no longer had permission to distribute REF products in Florida.  Sometime after that phone call, REF NA appointed Sayn Beauty as a distributor in the state, although according to defendants, Sayn Beauty never actually sold any products in Florida.

### V.     Amazon.com Sales

Instead, as early as March 2022, Edward Ernstberger and other REF representatives began having discussions with Sayn Beauty about selling REF products on Amazon. Although Connolly normally would have been involved in authorizing new U.S. distributors, he was *not* involved in recruiting or negotiating with Sayn Beauty with regard to online sales, and the evidentiary record leaves unclear whether Sayn Beauty ever negotiated with any REF NA employees about internet sales or simply negotiated directly with REF Int'l employees.  Regardless, these discussions arose in part by the presence of several unauthorized sellers of REF products on Amazon who were undercutting REF's authorized distributors in the U.S.

According to defendants, REF NA had intended to notify its current distributors about potential online sales before it authorized Sayn Beauty to make any, but after

receiving a shipment of REF products directly from REF Int'l, Sayn Beauty began selling them on Amazon at below-market prices without REF NA's permission.[6]  Regardless, Sayn Beauty began selling REF products direct to consumers into Wisconsin, Minnesota, Iowa, and North Dakota.  After Edward Ernstberger discovered that Sayn Beauty had begun online sales without REF NA's permission, however, he directed Sayn Beauty to take down its Amazon store.  REF also proceeded to terminate its relationship with Sayn Beauty.

## VI.    Post-Lawsuit Developments

Brava filed this lawsuit against REF NA in December 2022, seeking injunctive relief and damages based on allegations that defendant wrongfully terminated its rights to distribute REF haircare products in Florida, implemented online direct-to-consumer sales, and failed to fulfill Brava's purchase orders.  The court initially granted a temporary restraining order against REF NA.  (Dkt. #13.)  After holding a hearing on Brava's motion for preliminary injunction in January 2023, the court issued a written opinion on February

---

[6] Brava contends that REF NA is judicially estopped from taking the position that it never gave Sayn Beauty permission to sell REF products online because REF NA conceded at the preliminary injunction stage that Sayn Beauty had received its permission.  However, failing to dispute a proposed fact at the preliminary injunction stage does not amount to a binding admission by defendants.  In particular, Brava has pointed to *no sworn* statement or pleading in which defendants admitted that they gave Sayn Beauty permission to sell products online; rather, defendant has consistently denied that allegation in its answers.  (*E.g.*, Ans. to Am. Cpt. (dkt. #43) ¶¶ 5, 45, 56, 74, 84–89 (denying that REF NA authorized Sayn Beauty to sell products online.)  Finally, Brava cites no authority that failing to dispute a proposed finding of fact at a preliminary injunction stage qualifies as a "judicial admission."  *See Keller v. United States*, 58 F.3d 1194, 1198 n. 8 (7th Cir. 1995) ("Judicial admissions are formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them.").  Indeed, the law is to the contrary. *Aitken v. Debt Mgmt. Partners, LLC*, No. 1:12-CV-01511-JEH, 2015 WL 433508, at *2 (C.D. Ill. Feb. 2, 2015) (statements identified as "undisputed" at summary judgment were *not* "judicial admissions" that bound parties at later stages of the case); *Greenwich Indus., L.P. v. Specialized Seating, Inc.*, No. 02 C 5000, 2003 WL 21148389, at *1 (N.D. Ill. May 16, 2003) (same) (emphasis added).

7, 2023, granting that motion in part, finding Brava had a substantial likelihood of proving that it was granted an exclusive right to sell REF products to retailers or customers within Wisconsin, Minnesota, Iowa and North Dakota, as well as that it had invested substantial time, effort and money promoting REF products in that territory.  (Dkt. #41.)  The court further found that defendant's introduction of direct online sales of REF haircare products into Brava's exclusive territory would effect a substantial change in Brava's competitive circumstances without proper notice in violation of the WFDL.  Finally, the court found that Brava had a substantial likelihood of irreparable injury, both with direct evidence of the financial impact internet sales had or would have on its business and with the benefit of a presumption of such injury under the WFDL, Wis. Stat. § 135.065.

As a consequence, the court entered a preliminary injunction requiring REF NA: (1) continue to refer to Brava all orders for REF products originating from or seeking shipment into Brava's exclusive territory; (2) make all reasonable efforts to ensure that its authorized distributors and retailers of REF products in the United States discontinue the sale of all REF products online into that territory, whether on Amazon.com or any other website; and (3) fulfill Brava's purchase orders on an equal, non-discriminatory basis with all other distributors.  (Dkt. #42.)  However, the court declined to extend the reach of the preliminary injunction beyond Brava's exclusive, established territory in the upper Midwest.

Following the entry of the injunction, REF Int'l attempted to negotiate a contract with Amazon that would exclude shipment of REF products to Wisconsin, Minnesota, Iowa and North Dakota.  Amazon responded that it does not restrict purchasers

12

geographically.  In addition, Amazon informed REF Int'l that it would not remove the current unauthorized sellers of REF products from its website unless REF Int'l had a contract with Amazon that established it as a "registered brand."  At this time, neither REF NA nor REF Int'l sells REF products online; nor have they authorized any other distributor to do so.

Since January 2023, REF NA has also imposed the following new requirements and changes on Brava and its other U.S. distributors:

1) Distributors must provide monthly reports to REF NA listing their customers and sales, although Brava has refused to provide the information to REF NA.

2) REF NA changed its rewards program, eliminating the quarterly rebates that distributors could earn for sales of REF products, which according to Mr. Connolly, was explained to its distributors as instituted for tax reasons.

3) Distributors can only order products during specific weeks according to a new ordering schedule.

4)  Distributors may no longer order products using credit cards.

According to Brava, REF NA provided no notice before making these changes, and has provided no good explanation for why the changes were made.

OPINION

Brava moves for summary judgment against REF NA on counts I, II and III of its second amended complaint.  Counts I and II raise claims under the WFDL and Count

13

III is a breach of contract claim.[7]  Plaintiff also moves for summary judgment on REF NA's counterclaims.

On a motion for summary judgment, the question is whether there are any genuine factual disputes that could make a difference to the outcome of the case; or stated another way, whether a reasonable jury could find for the nonmoving party after drawing all reasonable inferences in that party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 314–15 (7th Cir. 2011); *Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010).

## I.    WFDL Claims

The WFDL governs the relationship between goods manufacturers and dealers.  It was enacted to protect dealers from unfair treatment by manufacturers who often have superior bargaining power over those distributing their goods.  Wis. Stat. § 135.01.  The WFDL prohibits manufacturers from terminating, cancelling, failing to renew, and/or substantially changing the competitive circumstances of a dealership contract without good cause, adequate notice, and meeting other statutory requirements.  Wis. Stat. § 135.03–04.  Here, plaintiff contends that defendant REF NA violated the WFDL by:  (1) de facto terminating its Florida dealership agreement in permitting Sayn Beauty to sell REF products online; and (2) substantially changing plaintiff's competitive circumstances in various ways.

---

[7] Brava does not move for summary judgment on Count IV (fraudulent misrepresentation) or Count V (breach of the duty of good faith and fair dealing) of the second amended complaint.

### A. Scope of Brava's Dealership under the WFDL

As an initial matter, defendant REF NA concedes it had a dealership relationship with plaintiff that was protected by the WFDL, but REF NA argues that the protection only extends geographically as set forth expressly in the original, written dealership contract -- *i.e.* an exclusive right to distribute REF products in Wisconsin and Minnesota. Plaintiff disagrees, arguing that the WFDL also protected its distributorship rights in North Dakota, Iowa, and most recently, Florida.

The primary legal authority on the territorial reach of the WFDL is found in *Morley-Murphy Co. v. Zenith Elecs. Corp.*, 142 F.3d 373, 378 (7th Cir. 1998), which held that a dealer may not base a WFDL claim on lost profits from the termination of out-of-state dealerships. In *Morley-Murphy*, the plaintiff was a Wisconsin-based electronics distributor with separate dealerships in Wisconsin and several other states, including Minnesota and Iowa. *Id.* at 374. The court reversed a jury award for lost future profits under the WFDL for plaintiff's sales through its Iowa and Minnesota dealerships, reasoning that applying the WFDL to dealerships in other states would pose a risk of violating the dormant Commerce Clause's prohibition against unduly burdening or discriminating on interstate commerce. *Id.* at 379. Relying on language in the WFDL *and* the general presumption against extraterritorial state regulation that Wisconsin courts have applied in other contexts, the court ultimately construed the statute narrowly not to reach the termination of dealerships located outside of Wisconsin. *Id.* at 378–79. 381.

Even so, plaintiff contends that *Morley-Murphy* does not control the outcome here, because its distribution of REF products in North Dakota, Iowa and Florida was *a part of*

*its* exclusive dealership contract for Wisconsin and Minnesota.  In so arguing, plaintiff rightly distinguishes itself factually from *Morley-Murphy* in that Brava distributed all REF products from its Wisconsin headquarters under a single dealership agreement governed by Wisconsin law.  The recognized treatise on the WFDL has recognized the possible importance of these distinctions.  *See* Michael A. Bowen, Brian E. Butler, Cassandra H. McCauley, and Joseph P. Wright, *The Wisconsin Fair Dealership Law*, 5ed 2022, 2-4–7 (It is not clear "how *Morley-Murphy* should be applied to termination of a single dealership located in and operating exclusively from Wisconsin but making sales to buyers within and outside the state.").  In addition, plaintiff's dealership agreement gave Brava a right of first refusal with respect to any prospective sales of REF products in states neighboring Wisconsin and Minnesota without an appointed dealer, albeit REF NA only gave Brava the right to distribute its products in "those portions of North Dakota and Iowa where REF did *not* have a distributor" already, noting that Iowa has long been divided into two parts serviced by two distributors.  (REF Br. (dkt. #118) 4 (emphasis added)).

In the end, neither side provides any evidentiary support for their respective positions beyond vague statements by Marcks and Connolly about the companies' respective rights in North Dakota and Iowa.  For example, neither side provides definitive evidence that plaintiff's dealership contract was amended, in writing or orally, to address the specific nature of plaintiff's distributorship rights in North Dakota or Iowa; nor do the parties provide any specifics regarding communications or sales practices by the companies within those two states.  Without additional information, therefore, the court cannot determine the nature or extent of plaintiff's distributorship rights in North Dakota and

16

Iowa on the record at summary judgment, much less the extent to which the WFDL applies to portions of those two states under the parties' dealership agreement.  Still, plaintiff has produced enough evidence for a reasonable jury to infer that portions of both states came under the terms of Brava's original dealership agreement protected by the WFDL, including the terms of that contract, the conduct of the parties over numerous years, and the investment by Brava into sales of REF product in those states.

In contrast, the same evidence regarding plaintiff's arguable distributorship rights and practices in Florida is lacking.  As noted above, plaintiff points to an announcement at a conference, a couple of text messages, and an email from Paul Connolly as proof that REF NA approved expansion of plaintiff's Wisconsin dealership into Florida in late 2021 and the first part of 2022.  Unsurprisingly, REF NA vehemently disagrees that Brava was ever given anything more than permission to sell products in Florida on a temporary basis after its previous Florida dealer ceased distribution of REF products.  REF NA points to its repeatedly asking plaintiff for a business plan for its Florida operation as proof that a distribution agreement in Florida was never finalized or at least was conditional on REF NA's approval of a business plan that never materialized.  The parties also disagree as to whether plaintiff's original, written dealership agreement was intended to govern REF sales activities in Florida.  While plaintiff maintains that all provisions of the existing dealership contract apply, REF NA argues that it never would have approved plaintiff as an exclusive distributor if it planned to operate Florida sales from its Wisconsin headquarters.

In short, whatever the parties' contractual rights may or may not be in Florida, a reasonable jury could not find that the protections of the WFDL extend to plaintiff's sales

17

in Florida.  First, the parties' written contract does *not* contemplate an extension of its terms outside the upper Midwest.  Second, the parties' relationship in Florida appears to stand on its own, whatever that may be.  Third, and most importantly, Brava's investment in that territory was more minimal and short-lived, and Brava has provided too little evidence regarding the terms, conditions and community of interest under which plaintiff's dealership activities expanded.  Thus, the court will consider plaintiff's WFDL claims only as they may apply to plaintiff's Wisconsin, Minnesota, North Dakota and Iowa contiguous dealerships.

### A. De Facto Termination based on Sayn Beauty's Online Sales and Substantial Changes to Brava's Competitive Circumstances

Plaintiff contends that REF NA's action of permitting Sayn Beauty to engage in online sales on Amazon resulted in a de facto termination of plaintiff's exclusive dealership. As discussed, plaintiff has not proven that it was ever granted an exclusive dealership in Florida protected by the WFDL, so plaintiff is not entitled to summary judgment on this claim.[8]

### B.  Substantial Changes to Brava's Competitive Circumstances

Plaintiff argues that REF NA violated the WFDL by imposing "substantial changes to the competitive circumstances" of its dealership agreement in the following ways: (1)

---

[8] Defendant did not move for summary judgment on any claim, so the court has not definitely ruled against plaintiff on its WFDL claim as it pertains to Florida.  However, plaintiff should be prepared to offer a robust proffer of evidence on this claim if it intends to present it at trial.

authorizing Sayn Beauty to sell REF products on Amazon to, among others, consumers in Brava's territory; (2) prioritizing orders from Sayn Beauty while failing to fulfill Brava's orders; (3) changing the rewards program without providing notice; (4) demanding that Brava now provide monthly reports detailing sales numbers and customers information; (5) terminating its acceptance of credit card payments with only 15 days' prior notice; and (6) limiting Brava's opportunities to order REF products to only specific weeks each month and only upon one week's notice.

As to the first allegation, there are genuine disputes of material fact that preclude summary judgment.  As discussed above, REF NA asserts that it never gave Sayn Beauty permission to sell products online.  Although it had contemplated doing so, REF NA had intended to discuss online sales with *all* its current distributors *first*.  REF NA further asserts that when it discovered Sayn Beauty had acted without its permission, the relationship was terminated with that company virtually before it began, and moreover, it has still not authorized any online sales of REF products to this day.  Importantly, plaintiff points to no evidence to contradict REF NA's assertions, such as a contract between REF NA and Sayn Beauty, or statements from anyone associated with REF NA or Sayn Beauty confirming that Sayn had permission to sell online.  Instead, plaintiff points only to a November 31, 2022, email message from Paul Connolly to Mr. Marcks stating that Edward Ernstberger "has drafted a letter to all distributors which can be shared with salons with the reasoning for going to Amazon."  (Dkt. #62-21.)  By itself, this email is *not* sufficient for a reasonable jury to find that REF NA ever gave Sayn Beauty actual permission to make Amazon sales, particularly in light of Connolly's testimony at his deposition that he had

19

no involvement in communications with Sayn about online sales *or* a Florida distributorship.  (Connolly dep. (dkt. #101) 177.)[9]

There are also genuine disputes of material fact regarding plaintiff's second assertion: that REF NA prioritized orders from Sayn Beauty while failing to fulfill Brava's orders.  Plaintiff's only evidence to support this claim is that REF NA was unable to fulfill certain orders to plaintiff, despite it appearing that Sayn Beauty was offering the same products online.  Again, this evidence is slim at best.  Significantly, the evidence actually shows that plaintiff and Sayn Beauty were receiving their products from different sources.  While plaintiff ordered from REF NA, Sayn Beauty received product directly from REF Int'l, and there is no evidence in the record about who authorized Sayn's product requests.  Plaintiff does not explain the factual or legal basis for holding REF NA responsible for REF Int'l's apparent decision to send product to Sayn Beauty directly rather than through REF NA, if that is indeed what happened.  Thus, plaintiff is not entitled to summary judgment on this claim either.

With respect to plaintiff's remaining claims regarding changes and requirements that REF NA has recently imposed on its U.S. dealers, it has not established beyond reasonable dispute that these changes amounted to a "substantial change to the competitive circumstances," meaning a material discriminatory change or one "so severe as to threaten the dealership's viability."  *Bresler's 33 Flavors Franchising Corp. v. Wokosin*, 591 F. Supp. 1533, 1537 (E.D. Wis. 1984) *Remus v. Amoco Oil Co.*, 794 F.2d 1238, 1241 (7th

---

[9] Plaintiff also makes no argument that REF NA's communications with Sayn Beauty provided tacit permission for Sayn Beauty to sell online, or that its *anticipation* of permitting online sales would violate the WFDL.  Thus, the court will not consider these potential arguments either.

Cir. 1986) (§ 135.05 bars grantor action that has "substantially adverse although not lethal effects"); *Conrad's Sentry, Inc. v. Supervalu, Inc.*, 357 F. Supp. 2d 1086, 1099–100 (W.D. Wis. 2005) (substantial change in competitive circumstances includes changes "that were discriminatory or that were intended as constructive termination"); *Astleford Equip. Co., Inc. v. Navistar Int'l Transp. Corp.*, 632 N.W.2d 182, 191 (Minn. 2001) ("substantial change in the competitive circumstances" is one "that is material to the continued existence of the dealership, one that significantly diminishes its viability, its ability to maintain a reasonable profit over the long term or to stay in business").

Non-discriminatory, system-wide changes do not generally constitute a "substantial change in competitive circumstances." *See East Bay Running Store, Inc. v. NIKE*, 890 F.2d 996, 999–1000 (7th Cir. 1989) (WFDL provision forbidding substantial change is intended to protect the dealer from constructive termination, not "non-discriminatory system-wide changes"); *Remus*, 794 F.2d at 1240–41 (same). Here, plaintiff concedes that REF NA's changes are system-wide changes that apply to all dealers. Moreover, plaintiff fails to develop any persuasive argument as to how many of these seemingly reasonable requests -- asking for sales and customer information, reducing a rewards program for tax purposes, instituting an ordering schedule, and declining to accept credit card payments that result in high fees -- amounted to a "substantial change to Brava's competitive circumstances" as opposed to mere inconveniences. Thus, plaintiff is not entitled to summary judgment on these claims either.

## II.     Breach of Contract

Plaintiff also brings breach of contract claims against REF NA, again based on its claimed:  (1) refusal to fulfill plaintiff's orders; (2) termination of plaintiff's Florida dealership; and (3) permission for Sayn Beauty to sell REF products online into Brava's exclusive territory.  Although the elements of plaintiff's breach of contract claim are different than the elements of its WFDL claim, its motion for liability determinations at summary judgment fail for similar reasons.  Plaintiff has not shown that REF NA refused to fulfill plaintiff's orders or permitted Sayn Beauty to sell REF products online.  As for plaintiff's right to distribute REF products in Florida, plaintiff has provided too little information about the terms of the parties' agreement that permitted plaintiff to sell into Florida in the first place.  Accordingly, plaintiff is not entitled to summary judgment on its breach of contract claims either.

## III.    REF NA's Counterclaims

Finally, REF NA filed counterclaims for breach of contract, breach of the duty of good faith and fair dealing, and declaratory relief under the WFDL, all based on plaintiff's own, alleged failure to keep certain records as required by the parties' dealership agreement. (Dkt. #76.)  Plaintiff argues that the claims should be dismissed because they are simply mirror images of plaintiff's claims and are procedurally improper.  The court disagrees.

REF NA's counterclaims "arise out of the transaction or occurrence that is the subject matter of the opposing party's claim," and it is efficient to resolve all related claims in this lawsuit.  Moreover, there are genuine disputes of material fact regarding the parties'

course of conduct relating to communication of business information and records with each other, and those factual disputes preclude summary judgment on REF NA's counterclaims.

ORDER

IT IS ORDERED that

1. Defendant's motion for leave to file supplemental declaration (dkt. #132) is GRANTED.

2. Plaintiff's motion for partial summary judgment (dkt. #89) is DENIED.

3. The status conference set for July 24, 2024 IS CANCELLED.  The clerk of court is directed to schedule a conference with Magistrate Judge Boor to set a schedule for the remaining proceedings.

Entered this 16th day of July, 2024.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge